## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MALIK HODGE,

    Plaintiff,

    v.

UNITED AIRLINES,

    Defendant.

Civil Action No. 07-1527 (CKK)

## MEMORANDUM OPINION
(October 21, 2011)

This action was filed by Plaintiff Malik Hodge ("Hodge") against his former employer, United Airlines ("United") alleging race discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), and alleging denial of medical leave in violation of the Family Medical Leave Act of 1990, 29 U.S.C. §§ 2611 *et seq.* ("FMLA"). The Court previously dismissed Hodge's Title VII claim insofar as it was based on an alleged hostile work environment. *See Hodge v. United Airlines*, 666 F. Supp. 2d 14, 22-23 (D.D.C. 2009). Presently pending before the Court is United's [35] Motion for Summary Judgment filed by Defendant United Airlines ("United"). After considering the parties' briefs, the accompanying exhibits, and the applicable authorities, the Court shall grant United's motion for summary judgment for the reasons explained below.

## I. BACKGROUND

*A.*    *Hodge's Employment History with United Airlines*

Plaintiff Malik Hodge, an African American male, began working for Defendant United

Airlines as a flight attendant in 1995. Def.'s Stmt.[1] ¶ 1. United assigns its flight attendants to geographic areas called "domiciles," and Hodge was initially assigned to work in United domicile at John F. Kennedy airport ("JFK"). *Id.* In 1999, Hodge was transferred to United's domicile at the Hong Kong International Airport ("HKG"), where he remained until his termination in 2005. *Id.* ¶ 2. Hodge's first-line supervisor at United's HKG domicile was Ann Hsu ("Hsu"), an Asian female who held the title of Onboard Supervisor. *Id.* ¶ 3. Hsu provided day-to-day supervision of the flight attendants at the HKG domicile, including Hodge. *Id.* ¶ 4. From 2003 to 2005, Hodge's second-level supervisor was Steve Pais ("Pais"), a Caucasian male who held the title of Manager of Onboard Services. *Id.* ¶ 5. Hodge also refers to Pais as a "Base Manager."

Hodge received a series of infractions during his employment with United. On September 1, 1995, Hodge received an appearance infraction for wearing a non-regulation pin on his uniform. Def.'s Stmt. ¶ 24. On November 22, 1995, Hodge received an appearance infraction while at the JFK domicile for wearing an earring and for his non-regulation beard. *Id.* ¶ 25. On February 24, 1997, Hodge received another appearance infraction while at the JFK domicile for his non-regulation uniform and for reporting for duty twenty minutes late. *Id.* ¶ 26.

---

[1] The Court strictly adheres to the text of Local Civil Rule 7(h) (formerly Rule 56.1) when resolving motions for summary judgment. *See Burke v. Gould*, 286 F.3d 513, 519 (D.C. Cir. 2002) (finding that district courts must invoke the local rule before applying it to the case). The Court has advised the parties that it strictly adheres to Rule 7(h) and has stated that it "assumes facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." [24] Scheduling and Procedures Order at 5 (Jan. 8, 2010). Thus, in most instances the Court shall cite only to one party's Statement of Material Facts ("Stmt.") unless a statement is contradicted by the opposing party, in which case the Court may cite a party's Response to the Statement of Material Facts ("Resp. Stmt."). The Court shall also cite directly to evidence in the record, where appropriate.

On April 11, 2001, Hodge was counseled while at the JFK domicile for having an outdated manual, although Hodge disputes that his manual was outdated.  *Id.* ¶ 27; Pl.'s Resp. Stmt. ¶ 27. On May 9, 2003, Hodge received an "initial discussion" from his supervisor, Ann Hsu, regarding his dependability related to nine days of absence.  Def.'s Stmt. ¶ 28.

Both Hsu and Pais addressed Hodge several times regarding his hairstyle.  *See* Def.'s Ex. A (Arb. Hr'g Tr.) at 106-08, 303.  On or around May 21, 2002, Pais complained to Hodge about his dreadlocks, which Pais believed did not comply with United's regulations regarding appearance.  *See* Pl.'s Ex. A ("Hodge Decl.") ¶ 4.  Hodge believed that his dreadlocks did comply because the "locks" were "tamed" and in a "uniform series of twists" and did not extend past the top of his collar.  *Id.*  Hodge began to wear cornrows to accommodate Pais's concerns. *Id.*  In March 2002, In-Flight Supervisor Wendy Cheung expressed concern over Hodge's hair because she claimed it was falling in his face.  *Id.* ¶ 5.  Hodge responded that he would control his hair with a hair pin, and that appeared to alleviate her concerns.  *Id.*  Pais subsequently told Hodge that his hairstyle was intended for females.  *Id.*  On June 3, 2004, Pais gave Hodge an appearance infraction for failing to comply with United's hair regulations.  Def.'s Stmt. ¶ 30.  On July 17, 2004, Hodge arrived for work thirty-five minutes before check-in time and reported to Pais.  Hodge Decl. ¶ 6.  According to Hodge, his hairstyle was in compliance with United's regulations when he checked in.  *Id.*  However, Pais determined that Hodge was not in compliance and removed him from the work schedule.  *Id.*  Hodge put on a short Afro wig and was in uniform prior to check-in time, but Pais did not return him to the work schedule, although Pais decided to pay him for the flight.  *Id.*  After this incident, Hodge did not have any further problems with Pais.  Def.'s Stmt. ¶ 34.

B.       *Hodge Claims Sick Leave and Avoids Work on Christmas Day 2004*

Hodge was scheduled to work on December 25, 2004 departing from Hong Kong.  Def.'s
Stmt. ¶ 45.  On December 23, 2004, Hodge was working on a flight from San Francisco to Hong
Kong and allegedly injured his back while trying to pull out a stuck cart.  *Id.* ¶ 46.  According to
Hodge, his injury was a recurrence of injuries he sustained in an automobile accident in the
District of Columbia on October 20, 2004.  Hodge Decl. ¶ 8.  Hodge claims that this injury sent
him into "shock," causing him to experience a "shooting" pain in his leg and upper and lower
back.  Def.'s Stmt. ¶ 47.  Hodge claims that he had difficulty moving and performing his duties
as a flight attendant for the remainder of the flight.  *Id.* ¶ 48.  Hodge did not state to any of his
colleagues that he was injured, and he did not immediately report the injury to his supervisor
because she was not on the flight.  Hodge Decl. ¶ 8.

Flight attendants who are injured while flying or while on layover are required to
immediately notify their supervisor within twenty-four hours, place themselves on sick leave,
seek timely and appropriate medical care, and prepare and submit an injury report to their
domicile supervisor.  Def.'s Stmt. ¶ 38.  Hodge did not fill out an injury report because he
believed that United's policy on in-flight injuries did not apply to preexisting injuries.  Hodge
Decl. ¶ 8.  Hodge decided to travel to the District of Columbia to seek medical treatment for his
injury.  *Id.* ¶ 10.  Although United generally prohibits flight attendants from flying while on sick
leave, flying is permitted to seek medical treatment.  *Id.*  After arriving in Hong Kong on the
evening of December 23, 2004, Hodge telephoned his doctor's office and left a message on its
answering service indicating that he was in a lot of pain and needed to see a doctor immediately.
*Id.* ¶ 11.  The answering service informed Hodge that the office was closed through the holidays

and the first appointment available was on January 3, 2005.  *Id.*  On December 24, 2004, at approximately 1:46 a.m. local Hong Kong time, Hodge's wife made a reservation for Hodge to travel "space available" from Hong Kong to Washington, D.C.  Def.'s Stmt. ¶ 60.  On December 24, 2004, Hodge and his wife flew "space available" on United from Hong Kong to Washington, D.C., with a connection in San Francisco.  *Id.* ¶ 63.

Under United's sick leave policy, flight attendants who are incapacitated due to illness or injury and are unable to work their scheduled flights are required to call their supervisor or United's Flight Attendant Service Center.  Def.'s Stmt. ¶ 36.  Because of the high rate of unscheduled absences during the Christmas holidays, supervisors at United pay careful attention to flight attendants who call in sick during the holiday season to ensure there is a legitimate basis for their absence.  *Id.* ¶ 44.  Hodge did not call United's Flight Attendant Service Center on the evening of December 23, 2004 or during the morning of December 24, 2004 or at any point prior to leaving Hong Kong to report that he would be unable to work his scheduled flight on December 25, 2004.  *Id.* ¶¶ 61-62.  Hodge did call the Flight Attendant Service Center during his layover in San Francisco and reported that he would be unable to fly on Christmas Day.  *Id.* ¶ 65.  Hodge knew that it was it was the operator's job to ask flight attendants for contact information, but the operator did not ask, and so Hodge offered to provide it.  Hodge Decl. ¶ 13.  Hodge claims that the operator stated that it was not necessary for him to provide contact information.  *Id.*  United disputes Hodge's account of his call to the Flight Attendant Service Center.

Hodge and his wife spent Christmas Day at their apartment in Washington, D.C.  Def.'s Stmt. ¶ 70.  On December 28, 2004, Hodge flew to New York City for a dentist appointment that Hodge had scheduled months earlier.  *Id.* ¶ 70; Hodge Decl. ¶ 14.  Hodge chose to fly to New

York on U.S. Airways rather than use his free flying privileges on United because U.S. Airways operated out of Reagan National Airport, which was closer to his home; Hodge paid only $20 for his ticket to New York.  Hodge Decl. ¶ 14.

     C.     *United's Attempts to Reach Hodge*

United's Hong Kong domicile received an electronic notification of Hodge's request for sick leave on December 24, 2004.  Def.'s Stmt. ¶ 74.  Because Ann Hsu was on vacation, Onboard Services Coordinator Josephine Lau received the sick leave notification and, on December 26, 2004, made a routine sick leave follow-up call to Hodge's contact number listed in the automated notice sent by the Flight Attendant Service Center.  *Id.* ¶ 75.  Ms. Lau was unable to reach Hodge on December 26, 2004 using the telephone numbers listed in his official contact records.  *Id.* ¶ 76.  United requires flight attendants to keep their contact information up-to-date in their official records, and Hodge was aware of this policy.  *Id.* ¶¶ 39, 43.  Hodge also knew that the contact numbers listed for him in United's official records were local numbers in Hong Kong.  *Id.* ¶ 67.  Ann Hsu returned to the office on December 27, 2004 and unsuccessfully tried to reach Hodge at his local Hong Kong mobile and land lines listed in his official contact records.  *Id.* ¶ 77.  When Ann Hsu returned to the office again on January 1, 2005, there were no telephone messages or any other information regarding Hodge's whereabouts.  *Id.* ¶ 78.  She again tried to reach Hodge using his contact numbers but was unsuccessful.  *Id.* ¶ 79.  On January 2, 2005, Ann Hsu left a message for Hodge on his local number in Hong Kong and indicated that Hodge needed to provide medical documentation to substantiate his absence since December 25, 2004.  Def.'s Stmt. ¶ 80.  That same day, Hsu also called Hodge's emergency contact in his official contact list, which was a phone number for Hodge's mother in New York.

*Id.* ¶ 81.  Hsu received a message indicating that the number was no longer in service.  *Id.*

Having heard nothing from Hodge in over nine days, and given United's heightened awareness of unscheduled absences during the holiday season, Hsu sent Hodge a written medical directive to his home address in Hong Kong on January 2, 2005 ordering him to provide medical documentation to substantiate his absence to United's Seattle Medical Department by no later than January 7, 2005.  Def.'s Stmt. ¶ 82.  Pursuant to this medical directive, Hodge was required to provide documentation from his treating physician, which included his diagnosis, days of treatment and prognosis and expected return.  *Id.* ¶ 83.  The directive also warned Hodge that if he failed to comply, he could be discharged.  *Id.* ¶ 84.  On January 6, 2005, Hsu sent Hodge an "e-note" summarizing her unsuccessful attempts to reach him and reiterating the details of the medical directive.  *Id.* ¶ 85.  Hodge had access to United's "e-note" system from the United States.  *Id.* ¶ 86.  Hodge did not respond to Hsu's telephone messages, her "e-note," or the medical directive on or before January 7, 2005.  *Id.* ¶ 87.

Because she had not heard from Hodge, Ann Hsu contacted Lina Slack, a labor relations specialist with United.  Def.'s Stmt. ¶ 88.  Ms. Slack suggested that Hsu look up Hodge's travel records.  *Id.* ¶ 89.  When she did, she learned that Hodge had traveled to Washington, D.C. on December 24, 2004.  *Id.*

D.      *Hodge's Supervisor Issues Him a Letter of Charge*

Because Hodge had no contact with United since calling out sick on December 24, 2004 and had failed to respond to the messages and the medical directive that Hsu had sent him, Hsu issued Hodge a Letter of Charge on January 10, 2005.  Def.'s Stmt. ¶ 90.  Pursuant to the collective bargaining agreement between the Association of Flight Attendants (the "Union") and

United, if a flight attendant engages in misconduct which in the opinion of management may result in suspension or discharge, they receive a written Letter of Charge ("LOC") setting forth the precise charge(s) as well as a hearing on those charges where they can present witnesses and be represented by the Union.[2]  *Id.* ¶ 17.  A hearing on a Letter of Charge is conducted by the Manager of Onboard Services or his designee ("hearing officer"), but the hearing officer cannot be the same management representative who issued the Letter of Charge.  *Id.* ¶¶ 18-19.  At the conclusion of the hearing, the hearing officer is required to issue a Letter of Decision ("LOD") and determine the appropriate penalty if the flight attendant is found to have violated any of United's Articles of Conduct as set forth in the LOC.  *Id.* ¶ 20.  United's Articles of Conduct contain various standards of conduct to which flight attendants are required to abide, as well as the consequences for failing to do so.  *Id.* ¶ 8.

The Letter of Charge issued by Ann Hsu charged Hodge with violating Article 6 of the Articles of Conduct, which prohibits flight attendants from "falsely claiming sick, occupational or other paid leave or worker's compensation benefits or furnishing false information concerning absence."  Def.'s Stmt. ¶¶ 9, 91.  Flight attendants who are found to have violated Article 6 will be discharged absent mitigating factors.  *Id.* ¶ 10.  Hodge was aware that a violation of Article 6

---

[2] Hodge contends that United "always conducts an investigation of the alleged action or inaction before determining whether a Letter of Charge is to be issued."  Pl.'s Resp. Stmt. ¶ 17.  However, the record evidence he cites does not exactly support that contention.  Hodge relies on a message sent by his Union representative to United stating that "the investigation should of [sic] been completed before the LOC was issued" and that Ann Hsu told her that "due to special circumstances, the LOC had been issued even though the investigation was ongoing."  *See* Def.'s Ex. C.  Hodge also cites to an agreement between the Union and United that flight attendants be notified of any adverse reports which may serve as a basis for disciplinary action within fifteen days.  *See* Def.'s Ex. D ¶ K.  These facts do not establish that United "always" conducts and completes an investigation before issuing a Letter of Charge.

is a terminable offense. *Id.* ¶ 11.  The LOC also charged Hodge with violating Article 21, which

prohibits flight attendants from "fail[ing] to comply with oral or written instructions from a

member of company management or other person in authority," based on his failure to respond

to the medical directive Hsu issued on January 2, 2005. *Id.* ¶¶ 12, 92.  The LOC also charged

Hodge with violating Article 30, which prohibits flight attendants from having "unauthorized

absence[s] from work." *Id.* ¶¶ 13, 93.  Violations of Article 21 or 30 result in disciplinary action

up to and including discharge; discipline normally commences with a suspension unless the

situation or the employee's record warrants more severe action." *Id.* ¶ 14.

Steve Pais, Hodge's second-level supervisor, avers that he was not involved in drafting,

preparing, or advising Hsu regarding the LOC she issued to Hodge.  Def.'s Stmt. ¶ 94.  However,

Hodge avers that it is his understanding that company policy requires that a Letter of Charge be

approved by a Base Manager. *See* Hodge Decl. ¶ 15.[3]  There is some question as to whether

Hodge has personal knowledge of this alleged company policy since he acknowledges in his

declaration that his knowledge is based in part on "statements from [his] union representative."

*See id.*  Nevertheless, the Court shall assume for purposes of this motion either that Steve Pais

played some role in the issuance of the LOC or that United departed from company policy by

issuing the LOC without his approval.

Because Hsu knew that Hodge had traveled to the United States, she sent a copy of the

LOC to Hodge's secondary address in Riverdale, New York via Federal Express.  Def.'s Stmt.

¶ 95.  Hodge first learned that United was trying to contact him on or about January 11, 2005,

---

[3] There are two paragraphs numbered "15" in Hodge's declaration; this refers to the
second paragraph.

when his father notified him that the FedEx package had arrived containing the LOC.  Hodge

Decl. ¶ 15.[4]  Hodge had not checked his email because he understood that company policy

prohibited supervisors from sending mandatory reading information by email.  *Id.*  Hodge knew

after receiving the LOC that he was in "hot water" and facing possible termination.  Def.'s Stmt.

¶ 96.  Hodge did not call Hsu immediately after receiving the LOC; instead, he waited until

January 17, 2005, when he left her a voicemail message.  *Id.* ¶¶ 97-98.  Hodge informed Hsu that

he had received her "e-note" and that he had an appointment for January 18, 2005 and would

provide her with medical documentation.  *Id.* ¶ 99.  Hodge had additional conversations with

Hsu after January 17, 2005 regarding his absence on December 25, 2004 and the LOC she had

issued.  Def.'s Stmt. ¶ 100.  Hodge recorded all of his telephone conversations with Hsu without

her consent.  *Id.* ¶ 101.

   E.  *Hodge Provides United With Medical Documentation*

   Hodge saw his physician, Dr. Richard Meyer, in Washington, D.C. on January 3, 2005.

Def.'s Stmt. ¶ 102.  Dr. Meyer gave Hodge a medical note that indicated Hodge was under his

care for a "dorsal strain."  *Id.* ¶ 103.  Dr. Meyer did not indicate that Hodge was unable to work,

but he did list various physical limitations, including: "no pushing carts," "no lifting greater than

20 lbs.," and "minimum push/pulling."  *Id.*; Def.'s Ex. L (1/3/05 note).  Hodge did not submit

this note to the Seattle Medical Department.  Def.'s Stmt. ¶ 104.[5]  Instead, he asked Dr. Meyer's

secretary to provide him with a second medical note that contained no medical restrictions and

---

[4] This reference is to the first paragraph numbered "15" in Hodge's declaration.

[5] Hodge claims that he later submitted this note to United on January 18, 2005, although he does not identify to whom he sent it.  *See* Hodge Decl. ¶ 17.

indicated that Hodge was able to return to work on regular duty status. *Id.* ¶ 105. Hodge sent this second note to United's Seattle Medical Department on January 12, 2005. *Id.* ¶ 106. Hodge has admitted that the medical documentation he submitted to United on January 12, 2005 did not accurately reflect his work restrictions as they existed on January 3, 2005, when the first note was written. *Id.* ¶ 108. Hodge has also admitted that the second note contained "inaccurate information" and was "inconsistent" with the first note. *Id.* ¶ 109. The second note also contradicted a statement by Hodge's attorney in a cover letter that was submitted along with the note to United that Hodge would be unable to work until at least January 31, 2005. *Id.* ¶ 110. The second note also did not contain any information about Hodge's alleged incapacity on December 25, 2004. *Id.* ¶ 111. Hodge claims that the reason he did not send the first note was because he was concerned that Steve Pais would retaliate against him for asserting a right to leave based on his injury. *See* Hodge Decl. ¶ 16.

Due to this conflicting information, Dr. Michael Waring from the Seattle Medical Department requested clarification from Hodge's physician so he could make a determination whether Hodge's request for sick leave was substantiated. Def.'s Stmt. ¶ 112. Hodge claims that he never gave Dr. Waring consent to obtain his medical records. Hodge Decl. ¶ 18. In response to his request, Dr. Waring received a letter from Dr. Frederick Salter dated January 18, 2005 that clarified that Plaintiff was seen on January 3, 2005 and was placed on limited duty after Hodge reported he had stayed out of work on December 25, 2004 because of his pain. Def.'s Stmt. ¶ 113. On January 25, 2005, Dr. Waring approved Hodge's leave of absence as of January 3, 2005. *Id.* ¶ 114. However, because Hodge had not been seen by Dr. Meyer or Dr. Salter before that date, Dr. Waring would not approve Hodge's sick leave from December 25,

2004 until January 3, 2005.  *Id.* ¶ 114.  Dr. Waring concluded that Dr. Meyer could not

medically judge whether or not Hodge was incapacitated and could not work from December 25,

2004 until January 3, 2005 because Hodge had not been seen for treatment until that date.  *Id.* ¶

115.  Dr. Waring also concluded that based on the circumstances, including Hodge's failure to

seek treatment in Hong Kong and his decision to wait ten days before seeing a doctor, raised

doubts about the entire episode.  *Id.* ¶ 116.

      *F.*     *Hodge Files an Internal Complaint of Discrimination*

      On February 2, 2005, Hodge's attorney, Monalie Bledsoe, sent a letter to United

disputing the reasons for the Letter of Charge.  Def.'s Stmt. ¶ 117.  After addressing the LOC,

Ms. Bledsoe raised for the first time a series of alleged instances of "Harassment/Racial

Discrimination" between Hodge and Steve Pais that allegedly occurred between May 2002 and

July 2004.  *Id.* ¶ 118.  On April 28, 2005, United Senior HR Generalist Lisa Hurst-Woodbury

informed Hodge that his allegation of harassment and discrimination by Steve Pais was

inconclusive.  *Id.* ¶ 119.

      *G.*     *Hearing and Arbitration on Hodge's Letter of Charge*

      On February 18, 2005, a hearing was held to determine what, if any, action should be

taken as a result of the Letter of Charge issued to Hodge by Ann Hsu on January 10, 2005.

Def.'s Stmt. ¶ 120.  Hodge was represented at the hearing by three representatives from the

Union, and United was represented by Ann Hsu and Onboard Service Supervisor Alwin

Fernandes.  *Id.* ¶ 121.  Greg Brown ("Brown"), a Labor Relations Specialist from United's San

Francisco domicile served as the designee for Steve Pais and presided over the hearing.  *Id.* ¶

122.  Steve Pais did not participate in the hearing.  *Id.* ¶ 123.  Although Brown notes that he was

the designee of Steve Pais, Pais has stated that he did not have any involvement in selecting Brown to serve as the hearing officer. *Id.* ¶ 124. The record is unclear as to how Brown was selected to serve as the hearing officer. Hodge contends that when he entered the hearing, his union representative told him that the outcome would likely be unfavorable because Greg Brown was always brought in when United wants to terminate a flight attendant. *See* Hodge Decl. ¶ 19.

On March 10, 2005, Brown issued a Letter of Decision regarding the LOC issued by Hsu. Def.'s Stmt. ¶ 125. Brown considered all the evidence and witness testimony presented and upheld the violations of Articles 6, 21, and 30 alleged in the Letter of Charge. *Id.* ¶ 126. Brown noted that Hodge's sick leave request over the holidays was not itself suspicious, but "[t]ravelling half way around the world, without the ability to return in time for an assignment [he] knew [he] had before [he] left HKG, and then calling in sick for it from that location . . . brings all of [his] actions under suspicion." *Id.* ¶ 127. Brown added that "[b]eing unavailable for contact and remaining unavailable for contact for twenty-four days further substantiates [United's] suspicions and brings all of [Hodge's] actions into question." *Id.* ¶ 128. Brown concluded that the documentation submitted by Hodge was "incomplete and provided after the January 7th deadline, a clear violation of Article 21," and that Hodge "never submitted credible documentation to substantiate [his] absence from December 25th to January 3rd, a clear violation of Articles 6 and 30." *Id.* ¶ 129. Brown found that discharge was appropriate because an Article 6 violation warranted discharge, and this violation was "exacerbated" by Hodge's violations of Article 21 and 30. *Id.* ¶ 130. Brown added that United could have amended its charges against Hodge to include additional violations when he tape recorded his conversations with Ann Hsu, but it chose not to do so. *Id.* ¶ 131.

13

In accordance with the Union's collective bargaining agreement, Hodge appealed his termination to the System Board of Adjustment. Def.'s Stmt. ¶ 133. The System Board of Adjustment is composed of two representatives selected by the Union, two representatives selected by United, and one neutral representative who is designated by both parties as a chairperson. *Id.* ¶ 23. The System Board of Adjustment held a hearing on September 11 and November 14, 2006 and March 6 and 7, 2007, at which time both Hodge and United were afforded full opportunity to offer evidence and present, examine, and cross-examine witnesses under oath. *Id.* ¶ 134; Def.'s Ex. W (System Board of Adjustment Opinion) at 2. Hodge was not permitted to offer evidence at the hearing regarding his claims of discrimination by United. Hodge Decl. ¶ 20. On June 1, 2007, chairman George Nicolau, writing for the five-member Board, issued a twenty-one page opinion concluding that there was just cause for Hodge's termination and that Hodge had failed to present sufficient evidence that he was too sick or too injured to work on December 25, 2004. Def.'s Stmt. ¶ 135.

The Board found that Hodge's version of events was "simply implausible." Def.'s Stmt. ¶ 136. The Board reasoned that if Hodge was truly in "shock" when he re-injured his back during the December 23, 2004 flight, he would have been unable to work the remainder of the flight, or he should have said something about it to his colleagues, or his colleagues should have noticed his injury, but there was no evidence of any of that. *Id.* ¶ 137; Def.'s Ex. W at 16-17. The Board also found that Hodge's testimony was not credible in a number of respects, including that his physician, despite the severe pain described by Hodge, would not see him until January 3, 2005 because their offices were closed for the holidays, when in fact his physicians testified during the hearing that their offices were open during the holidays in 2004 and their office would

14

not have allowed a patient in severe pain to wait nearly eleven days for an appointment.  Def.'s Stmt. ¶ 138.  The Board also found that if Hodge had truly been in such severe pain, he would not have flown thousands of miles to Washington, D.C. only to wait eleven days for treatment, and he would not have waited so long to call out sick and then fail to provide a proper contact number where he could be reached.  *Id.* ¶ 139.  The Board concluded that the more likely version of events was not that Hodge was too injured to work or that he made unfortunate but understandable mistakes or that waiting ten days to see his doctors rather than seeing someone else right away was reasonable; rather, it was that Hodge was accompanying his wife for the holidays and did not want to be found.  Def.'s Ex. W at 18.  The Board also found it "equally disturbing" that Hodge would send contradictory medical information to United regarding his alleged medical condition.  *Id.*; Def.'s Stmt. ¶ 141.  The Board also found that it was reasonable for Dr. Waring to conclude that Hodge's medical documentation did not substantiate his absence on December 25, 2004 since it was solely based on Hodge's "subjective statements" to his physician regarding his condition on that day.  Def.'s Stmt. ¶ 142.

Based on these findings, the Board upheld the violation of Article 6 and concluded that Hodge placed himself on sick leave on December 25, 2004 when he was not ill.  Def.'s Stmt. ¶ 143.  Because the Article 6 violation clearly warranted discharge, the Board saw "no need to deal with [the] Article 21 and 30" charges that were stated in the Letter of Charge.  *Id.* ¶ 144.  Neither Hodge nor the Union moved to vacate, alter, or otherwise challenge the arbitration decision issued by the Board.  *Id.* ¶ 145.

H.    *United's History of Article 6 Discipline*

Since January 1, 2000, only two flight attendants at United's HKG domicile other than

15

Hodge were disciplined for violations of Article 6 of the Articles of Conduct.  Def.'s Stmt.

¶ 146.  Julius Malilay, an Asian male, received a Letter of Charge on June 17, 2003 from Ann

Hsu for falsely claiming sick leave in violation of Article 6.  Id. ¶ 147.  Mr. Malilay's Letter of

Charge was upheld and he was terminated for violating Article 6 on July 21, 2003.  Id. ¶ 148.

Nga Yee Debbie Wong, an Asian female, received a Letter of Charge on February 26, 2006 for

falsely claiming sick leave in violation of Article 6.  Id. ¶ 149.  Ms. Wong's Letter of Charge

was upheld and she was terminated on April 25, 2006.  Id. ¶ 150.  No other flight attendants at

United's HKG domicile were charged with violating Article 6 since January 1, 2000.  Id. ¶ 151.

> I.  *Hodge's Work Schedule*

Under the Union's collective bargaining agreement, the maximum number of hours a

flight attendant is permitted to work is 276 hours per quarter, or 1104 hours per year.  Def.'s

Stmt. ¶ 152.  Hodge worked less than 1250 hours in the twelve months preceding his

termination.  Id. ¶ 153.  Hodge was employed at United's HKG domicile in 1999 and remained

there until his termination in 2005.  Id. ¶ 154.  Hodge worked more than 70% of the time for

United from Hong Kong.[6]  Id. ¶ 155.  Hodge stated that he was a Hong Kong resident from 1999

to 2005.  Id. ¶ 156.  Hodge claimed exemption from U.S. federal income taxation from 1999 to

2005 because of his status as an overseas resident.  Id. ¶ 157.

> J.  *EEOC Determination*

On November 23, 2005, Hodge submitted a "Charge Questionnaire" with the Equal

Employment Opportunity Commission ("EEOC") indicating that United had discriminated

---

[6] The record does not indicate where the other 30% of Hodge's time was spent, although
presumably this includes time spent on flights and in other destination cities.

against him on the basis of race, color, disability, and "other."  *See* 666 F. Supp. 2d at 18.  On

January 12, 2006, the EEOC received a formal Charge of Discrimination filed by Hodge

claiming race-based discrimination and retaliation by United.  *Id.* at 19.  Following an

investigation, on January 10, 2007, the EEOC issued a determination that there was reasonable

cause to believe that United discriminated against Hodge because of his race and retaliated

against him for complaining of discrimination in violation of Title VII.  *See* Pl.'s Ex. F (EEOC

Determination).

## II. LEGAL STANDARD

Defendant has filed a motion for summary judgment pursuant to Federal Rule of Civil

Procedure 56.  "The court shall grant summary judgment if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a).

> A party asserting that a fact cannot be or is genuinely disputed must support the
> assertion by:
> (A) citing to particular parts of materials in the record, including depositions,
> documents, electronically stored information, affidavits or declarations, stipulations
> (including those made for purposes of the motion only), admissions, interrogatory
> answers, or other materials); or
> (B) showing that the materials cited do not establish the absence or presence of a
> genuine dispute, or that an adverse party cannot produce admissible evidence to
> support the fact.

Fed. R. Civ. P. 56(c)(1).  "If a party fails to properly support an assertion of fact or fails to

properly address another party's assertion of fact as required by Rule 56(c), the court may . . .

consider the fact undisputed for purposes of the motion."  Fed. R. Civ. P. 56(e).  When

considering a motion for summary judgment, the court may not make credibility determinations

or weigh the evidence; the evidence must be analyzed in the light most favorable to the

nonmoving party, with all justifiable inferences drawn in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "If material facts are at issue, or, though undisputed, are susceptible to divergent inferences, summary judgment is not available." *Moore v. Hartman*, 571 F.3d 62, 66 (D.C. Cir. 2009) (citation omitted).

The mere existence of a factual dispute, by itself, is insufficient to bar summary judgment. *See Liberty Lobby, Inc.*, 477 U.S. at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* For a dispute about a material fact to be "genuine," there must be sufficient admissible evidence that a reasonable trier of fact could find for the nonmoving party. *Id.* The Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. "If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted). The adverse party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Conclusory assertions offered without any factual basis in the record cannot create a genuine dispute. *See Ass'n of Flight Attendants-CWA v. U.S. Dep't of Transp.*, 564 F.3d 462, 465-66 (D.C. Cir. 2009).

### III. DISCUSSION

In his Complaint, Hodge asserts claims for race discrimination and retaliation in violation of Title VII and for a violation of the FMLA. Specifically, Hodge contends that his termination by United was motivated by race discrimination and constituted retaliation for his complaint about such discrimination. United denies any such discriminatory or retaliatory motive and

contends that Hodge was terminated based on his violation of United policies concerning sick leave.  United also contends that Hodge's retaliation claim fails as a matter of law because he could not have reasonably believed that the conduct he was opposing was unlawful.  United contends that Hodge's FMLA claim must fail because Hodge did not work enough hours to be eligible for leave under the FMLA and because he was employed in Hong Kong, where the FMLA does not apply.  The Court shall evaluate the parties' contentions below.

       A.      *Hodge's Claims for Discrimination and Retaliation Under Title VII*

Title VII makes it unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, condition, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  Title VII also contains an anti-retaliation provision that makes it unlawful for an employer to "discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  *Id.* § 2000e-3(a).  In the absence of direct evidence of discrimination or retaliation, Title VII claims are assessed pursuant to a burden-shifting framework initially set out by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973).  Pursuant to that framework, the plaintiff has the initial burden of proving by a preponderance of the evidence a prima facie case of discrimination or retaliation.[7]  *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-

---

[7] To establish a prima facie case of discrimination, the plaintiff must show that (1) he is a member of a protected class; (2) he suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination.  *Wiley v. Glassman*, 511 F.3d

53 (1981).  Then, "the burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason for the [adverse employment action].'"  *Id.* at 253 (quoting *McDonnell Douglas*, 411 U.S. at 802).  However, the D.C. Circuit has stressed that once an employer has proffered a nondiscriminatory reason, the *McDonnell Douglas* burden-shifting framework disappears, and the court must simply determine whether the plaintiff has put forward enough evidence to defeat the proffer and support a finding of retaliation.  *Woodruff v. Peters*, 482 F.3d 521, 530 (D.C. Cir. 2007); *see also Brady v. Office of the Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008) ("[W]here an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision, the district court need not—*and should not*—decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*.").

In reviewing a motion for summary judgment, the Court "looks to whether a reasonable jury could infer . . . retaliation from all the evidence, which includes not only the prima facie case but also the evidence the plaintiff offers to attack the employer's proffered explanation for its action and other evidence of retaliation."  *Jones v. Bernanke*, 557 F.3d at 677 (internal quotation marks omitted); *accord Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1289 (D.C. Cir. 1998) (en banc) ("[T]he focus of proceedings at trial (and summary judgment) will be on whether the jury could infer discrimination from the combination of (1) the plaintiff's prima facie case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the

_____

151, 155 (D.C. Cir. 2007).  To establish a prima facie case of retaliation, the plaintiff must show that (1) he engaged in statutorily protected activity; (2) he suffered a materially adverse action by his employer; and (3) a causal connection existed between the two.  *Id.*

plaintiff (such as independent evidence of discriminatory statements or attitudes on the part of the employer) or any contrary evidence that may be available to the employer (such as evidence of a strong track record in equal opportunity employment).").  A plaintiff may establish pretext by producing evidence that suggests the employer was "making up or lying about the underlying facts that formed the predicate for the employment decision" or by demonstrating that the employer treated similarly situated persons who are not in the protected class more favorably. *Brady*, 520 F.3d at 495.  "If the employer's stated belief about the underlying facts is reasonable in light of the evidence, however, there ordinarily is no basis for permitting a jury to conclude that the employer is lying about the underlying facts."  *Id.*

Because United has asserted a legitimate nondiscriminatory reason for firing Hodge, the Court must determine whether Hodge has "produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against [him] on the basis of race."  *Brady*, 520 F.3d at 494.  Hodge contends that United's decision to fire him is pretext because: (1) United's process for terminating him was filled with irregularities that can be traced to Steve Pais, whom Hodge contends harbored discriminatory animus against him; (2) United has treated other similarly situated employees more favorably; and (3) the Equal Employment Opportunity Commission made a finding of "reasonable cause" to support Hodge's claims of discrimination and retaliation.  The Court shall evaluate each of these claims below.

### 1.   Procedural Irregularities in Hodge's Termination

Hodge contends that a reasonable jury could infer that Hodge was not actually terminated for falsely claiming sick leave based on a series of "irregularities" in the process it used to

terminate him.  Specifically, Hodge contends that United failed to conduct a full and fair investigation before issuing a Letter of Charge, illegally obtained Hodge's medical records without his consent, and held a "sham hearing for which the sole purpose was to rubber-stamp Mr. Pais' decision to terminate [him]."  Pl.'s Opp'n at 6.  However, the record does not support Hodge's conclusory assertions.

First, Hodge contends that Ann Hsu violated company policy by issuing a Letter of Charge without first completing a full investigation.  However, Hodge has not identified any such company policy or any other evidence that suggests it was improper for United to issue a Letter of Charge before its investigation was completed.  Hodge refers to Article 25 of the collective bargaining agreement between the Union and United, but Article 25 contains no requirement that United conduct any investigation, only that flight attendants be provided with copies of any reports that may serve as the basis for disciplinary action.[8]  Even assuming that United's normal practice is to wait until an investigation is completed before issuing an LOC, Hodge has failed to demonstrate that any departure from that practice in his case undermines its proffered reason for filing charges against him.  The record indicates that Ann Hsu filed the Letter of Charge after Hodge repeatedly failed to respond to messages that were left for him and failed to provide medical documentation to substantiate his sick leave request.  Based on the timing and circumstances of Hodge's claim for sick leave, it was reasonable for United to charge him with violating its Articles of Conduct even before a full investigation was completed.

---

[8] Hodge claims in his opposition brief that his union representative was not provided with copies of reports relating to the investigation.  According to the record cited by Hodge, it appears that Hodge's union representative did not receive a copy of any report because the investigation was ongoing.  *See* Pl.'s Ex. C.  It also appears that United resolved this issue with Hodge's representative.  *See id.*

Second, Hodge contends that United unlawfully obtained his medical records without consent. Although the record clearly establishes that Dr. Waring obtained records from Hodge's physician and that Hodge did not explicitly give his consent for him to do this, Hodge has not demonstrated that this conduct was unlawful or that it violated any company policy.[9] Morever, even assuming that this was improper, it does not cast aspersions on United's decision to terminate Hodge.

Third, Hodge contends that Steven Pais deliberately chose Greg Brown to serve as the hearing officer in order to ensure that Hodge would be terminated. However, there is no support in the record for Hodge's contention that his hearing was a "sham." Construing the record most favorably to Hodge, Pais may have played a role in selecting Brown as hearing officer. However, Hodge's statements about what his union representative told him about Brown are not admissible to prove bias by Brown. *See Greer v. Paulson*, 505 F.3d 1306, 1315 (D.C. Cir. 2007) ("'Sheer hearsay' . . . 'counts for nothing' on summary judgment." (quoting *Gleklen v. Democratic Cong. Campaign Comm., Inc.*, 199 F.3d 1365, 1369 (D.C. Cir. 2000))). The only other evidence that supports Hodge's claim that he did not get a fair hearing from Brown is the fact that Brown precluded Hodge from presenting evidence about his discrimination claims. However, Brown's decision to limit the scope of the hearing to the issues raised by the Letter of Charge was a perfectly reasonable one and does not imply that Brown was biased against Hodge

---

[9] The only authority Hodge cites in support of his claim of illegality is a barely legible copy of the first page of a document entitled "HIPAA Privacy Notice." *See* Pl.'s Ex. M. This notice does not suggest that Dr. Waring acted unlawfully by asking Hodge's physician for clarification of the note that Hodge had submitted to substantiate his claim for sick leave. The Court also notes that the privacy rule promulgated under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), 45 C.F.R. § 164, does not apply directly to employers. *See Harris v. Vescom Corp.*, No. CV406-291, 2007 WL 1810159, at *2 (S.D. Ga. July 10, 2007).

in any way.  Accordingly, Hodge has failed to produce evidence that suggests Brown's Letter of Decision—which was upheld by the System Board of Adjustment—was not based on evidence that Hodge had violated United's Articles of Conduct.

Hodge contends that the charges filed against him were baseless and that he did not violate United's Articles of Conduct.  But the undisputed facts in the record are that Hodge failed to tell anyone at United that he re-injured his back while on duty on December 23, 2004; he returned to the United States the following day for medical treatment but did not see a doctor until January 3, 2005; he waited until he reached San Francisco to call in sick; he did not provide United with contact information where he could be reached in the United States; and he submitted false information in response to United's request for documentation of his medical condition.  Hodge responds that he did not believe he was required to report a "re-injury" while on the job, he was permitted to fly home to seek medical treatment from his own doctor, and he was only required to call in sick twelve hours before his scheduled flight on December 25, 2004. But based on the record before it, United was entitled to conclude that Hodge's story was implausible, and this Court may not "second-guess an employer's personnel decision absent demonstrably discriminatory motive."  *Milton v. Weinberger*, 696 F.2d 94, 100 (D.C. Cir. 1982). "It is not enough for the plaintiff to show that a reason given for a job action is not just, or fair, or sensible.  He must show that the explanation given is a phony reason."  *Fischbach v. D.C. Dep't of Corrs.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (quoting *Pignato v. Am. Trans Air, Inc.*, 14 F.3d 342, 349 (7th Cir. 1994)).  Therefore, Hodge's disagreement with United's decision is not sufficient to establish that it was pretext for discrimination.

2.     United's Treatment of Similarly Situated Individuals

Hodge also attempts to establish pretext by demonstrating that United has treated

similarly situated individuals who are Caucasian more favorably than those who are not.  Hodge

relies on evidence that between January 1, 2000 and January 1, 2006, United disciplined 20

flight attendants in the Hong Kong domicile for violations of Articles 6, 21, or 30, and only 4 of

those flight attendants were white, 3 were black, and 13 were Asian.  Hodge also points out that

United has terminated two Asian employees for unauthorized absences but has not terminated

any Caucasian employees for this reason.  However, these statistics are meaningless because

Hodge has not provided any evidence of the racial composition of the Hong Kong domicile

during this time period.  *See Horvath v. Thompson*, 329 F. Supp. 2d 1, 11 (D.D.C. 2004)

(holding that statistical evidence about the gender of employees who obtained promotions was

irrelevant unless compared to evidence about the gender composition of the pool of eligible

applicants).  Without some sort of comparison, demonstrating that a majority of the employees

disciplined in the Hong Kong domicile are non-white (and mostly Asian) does nothing to suggest

that Hodge was disciplined because of his race.

Hodge also relies on three examples of similarly situated white employees who were

treated more favorably by United.  *See* Pl.'s Opp'n at 12-13.  The first employee allegedly failed

to attend a mandatory training session and failed to respond to a medical directive but was not

terminated.  The second employee allegedly had several unauthorized absences but was

permitted to retire in lieu of being terminated.  The third employee allegedly harassed and

intimidated employees at United and threatened legal action, but he was merely given

counseling.  Hodge contends that these examples show that United was biased in favor of its

25

white employees.

In order to show that an employee is similarly situated, a plaintiff must "demonstrate that all of the relevant aspects of [his] employment situation were 'nearly identical' to that of the employee." *Neuren v. Adduci, Mastriani, Meeks & Schill*, 43 F.3d 1507, 1514 (D.C. Cir. 1995). "[T]he co-workers must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Childs-Pierce v. Util. Workers Union of Am.*, 383 F. Supp. 2d 60, 70 (D.D.C. 2005) (quotation marks and citation omitted), *aff'd*, 187 F. App'x 1 (D.C. Cir. 2006).  Hodge has failed to demonstrate that the three employees he identifies were truly similarly situated to him.  With respect to the first employee, Hodge has not shown that she actually failed to respond to a medical directive in violation of Article 21, and the record shows that the medical directive was not sent by Ann Hsu or Steve Pais.  *See* Pl.'s Ex. I at 10-11.  With respect to the second employee, the record shows that he did have several unauthorized absences in violation of Article 30, but the record also shows that he received suspensions for these infractions and that he ultimately retired.  *See* Def.'s Exs. CC at 2-7, DD at 8-9.  With respect to the third employee, the record indicates only that he threatened a supervisor over the phone during March 2009, *see* Pl.'s Ex. G; Hodge has failed to explain how this action could have constituted a violation of Articles 6, 21, or 30.  Most significantly, none of these three employees were charged with violating Article 6, which was the primary basis for Hodge's dismissal.  Furthermore, Hodge has not shown that they were disciplined by the same supervisors.

Accordingly, the Court finds that Hodge's evidence of United's treatment of other

employees fails to provide sufficient evidence to suggest that his termination was a pretext for discrimination.

### 3.   The EEOC's Finding of Reasonable Cause

Finally, Hodge contends that United's motion for summary judgment should be denied because the Equal Employment Opportunity Commission issued a finding that there was "reasonable cause" to believe that United discriminated against Hodge because of his race and retaliated against him for complaining about this discrimination.  However, "[i]t is well established that an EEOC determination does not have any binding effect in a collateral Title VII civil action." *Francis v. District of Columbia*, 731 F. Supp. 2d 56, 72 n.7 (D.D.C. 2010) (citing *Scott v. Johanns*, 409 F.3d 466, 469 (D.C. Cir. 2005)).  While Hodge is correct that an EEOC determination may be admissible at trial in appropriate circumstances, the EEOC's determination in this case is not sufficient evidence to permit a jury to find a violation of Title VII, as it contains no factual analysis and merely provides a conclusion that reasonable cause exists.  *See Fields v. Riverside Cement Co.*, 226 F. App'x 719, 721 n.2 (9th Cir. 2007) ("EEOC reasonable cause determination letters alone are insufficient to defeat summary judgment. . . . The probative value of such letters is especially limited where, as here, their contents are conclusory and do not detail the basis for the EEOC's finding."); *Francis*, 731 F. Supp. 2d at 8 n.7 ("[T]he EEOC Determination is so unpersuasive and conclusory that, even if it could properly be admitted into evidence, no reasonable jury could find discrimination based on the Determination.").  Therefore, Hodge cannot survive summary judgment based solely on the EEOC's determination.

### 4.   Hodge's Evidence of Discriminatory or Retaliatory Motive

In this case, Hodge has produced scarcely any evidence of a discriminatory or retaliatory

motive for his termination.  Hodge claims that Steve Pais was racially biased against him based on his complaints about Hodge's dreadlocks.  Even assuming that Pais's comments to Hodge about his dreadlocks can be considered evidence of race discrimination, *but see Eatman v. United Parcel Service*, 194 F. Supp. 2d 256, 265 (S.D.N.Y. 2002) ("Locked hair . . . is not so closely associated with black people that a racially neutral comment denigrating it can reasonably be understood as a reflection of discriminatory animus, at least where there is no evidence that the speaker perceived the plaintiff's locked hair as related to his race."), Hodge concedes that he had no problems with Pais after July 2004, which was more than five months before the Letter of Charge was issued.  Furthermore, there is no evidence of discriminatory animus by Ann Hsu, who initially issued the LOC, or by Greg Brown, who sustained the charges, or by the System Board of Adjustment, which affirmed Hodge's dismissal.  Based on this record, no reasonable jury could conclude that Hodge's termination was motivated by discrimination.

Similarly, the only evidence Hodge has to support his theory of retaliation is the fact that he was terminated shortly after his lawyer wrote a letter to United complaining about the alleged discrimination.  But Hodge's lawyer wrote this letter after the Letter of Charge was issued, so the fact that Hodge was terminated based on the charges stated in the LOC does not give rise to an inference of retaliation.  Based on the record before the Court, no reasonable jury could conclude that Hodge's termination was motivated by retaliation.

Because Hodge has failed to produce evidence that rebuts the legitimate reason proffered by United for his termination, and because there is no evidence from which a reasonable jury could infer that his termination was motivated by racial discrimination or retaliation in violation

of Title VII, the Court shall grant United's motion for summary judgment on Hodge's Title VII

claims.  In light of this finding, the Court declines to reach United's alternative argument that his

lawyer's complaint about discrimination did not constitute protected activity under Title VII.

       B.     *Hodge's Claim for Violation of the Family and Medical Leave Act*

Hodge contends that United violated the FMLA by refusing to provide him with unpaid

medical leave for the injury he sustained in October 2004 and subsequent re-injury in December

2004.  There is no evidence in the record that Hodge ever specifically requested that he be given

leave under the FMLA.  However, Hodge contends that he put United on notice that he was

entitled to FMLA leave when he called in sick on December 24, 2004.  Even assuming that

Hodge gave United adequate notice that he needed FMLA leave, United contends that his FMLA

claim must be dismissed because (1) Hodge did not work the requisite number of hours to be

covered by the FMLA's leave provisions and (2) Hodge worked in Hong Kong, which is beyond

the territorial scope of the FMLA.  The Court shall consider each of United's arguments below.

       1.     The Minimum Hours Required Under the FMLA

The FMLA provides that, under certain circumstances, an employer must allow an

eligible employee to take up to twelve work weeks of leave during any twelve-month period

because of a serious health condition that prevents the employee from performing the functions

of his position.  *See* 29 U.S.C. § 2612(a)(1)(D).  Under the version of the FMLA that was in

effect at the time Hodge sought leave, Hodge was not eligible for leave unless he was employed

for at least 1250 hours of service during the previous twelve-month period.  *See* 29 U.S.C.

§ 2611(2)(A).  The parties agree that Hodge did not meet this threshold.  However, Congress

amended the FMLA in 2009 to provide that flight attendants may be covered if they have

worked at least 504 hours during the previous twelve-month period.  *See* Airline Flight Crew Technical Corrections Act, Pub. L. No. 111-119, § 2, 29 U.S.C. § 2611(2)(D).  Hodge contends that his FMLA claim should survive because he qualifies as an eligible employee based on this amendment to the FMLA.  United contends that the 2009 amendment is not retroactive and therefore Hodge's claim must be dismissed.

The Supreme Court has explained that "the presumption against retroactive legislation is deeply rooted in our jurisprudence."  *Landgraf v. USI Film Prods.*, 511 U.S. 244, 265 (1994).  "Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly."  *Id.*  The Court elaborated:

> When a case implicates a federal statute enacted after the events in suit, the court's first task is to determine whether Congress has expressly prescribed the statute's proper reach.  If Congress has done so, of course, there is no need to resort to judicial default rules.  When, however, the statute contains no such express command, the court must determine whether the new statute would have retroactive effect, *i.e.*, whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed.  If the statute would operate retroactively, our traditional presumption teaches that it does not govern absent clear congressional intent favoring such a result.

*Id.* at 280.  In this case, there can be little doubt that the applying the 2009 amendment to the FMLA would increase United's liability for past conduct and have retroactive effect.  Hodge has not identified, and the Court has not found, any clear directive from Congress that the 2009 amendment be applied retroactively.  Therefore, the Court must apply the traditional presumption that the 2009 amendment does not apply in this case.  Accordingly, the Court shall grant United's motion for summary judgment on Hodge's FMLA claim.

2.      The Territorial Scope of the FMLA

Alternatively, United contends that Hodge's FMLA claim should be dismissed because

30

the FMLA does not apply extraterritorially to employees, like Hodge, who are based in Hong

Kong.  FMLA regulations state that employees are not eligible for leave if they are "employed in

any country other than the United States or any Territory or possession of the United States."  29

C.F.R. § 825.800 ("Eligible employee").[10]  FMLA regulations also provide that for employees

with no fixed worksite, such as transportation workers, their "worksite" is "the site to which they

are assigned as their home base, from which their work is assigned, or to which they report."  *Id.*

§ 825.111(a)(2).[11]  Hodge does not dispute that he was assigned to work out of United's Hong

Kong domicile from 1999 until his termination in 2005 and that he was a Hong Kong resident

during this time period.  However, Hodge contends that he has attended numerous training

sessions in the United States, including Emergency Training in Honolulu in late 1999 or early

2000, Emergency Training in Chicago in 2000, and a "Mission United" conference in Chicago in

late 2001 or early 2002.  *See* Hodge Decl. ¶ 1.  Hodge also alleges that he routinely flew to and

stayed overnight in Washington, D.C., New York, Chicago, and San Francisco.  *Id.*  Therefore,

Hodge argues that a reasonable jury could conclude that he worked in the United States.

However, in light of the FMLA's regulatory guidance defining a worksite, it is clear that

Hodge's worksite was in Hong Kong because that was where he was assigned, where his work

was assigned, and where he reported.  Accordingly, the Court finds that no reasonable jury could

conclude that Hodge was employed in the United States.  Therefore, the Court may alternatively

---

[10] The FMLA implementing regulations must be "given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984).

[11] Employees are not eligible for FMLA leave if they work at a worksite where their employer employs less than 50 employees within a 75-mile radius.  29 U.S.C. § 2611(2)(B)(ii).

grant United's motion for summary judgment on this basis.

## IV. CONCLUSION

For the foregoing reasons, the Court finds that Hodge has failed to produce evidence sufficient for a reasonable jury to conclude that United did not terminate him for falsely claiming sick leave and instead terminated him because of his race or because he had complained about race discrimination.  The Court also finds that Hodge is not an eligible employee for purposes of the FMLA because he did not work enough hours to be eligible and because he was employed outside the United States.  Accordingly, the Court shall GRANT United's [35] Motion for Summary Judgment.  An appropriate Order accompanies this Memorandum Opinion.


Date: October 21, 2011


_____*/s/*_____
**COLLEEN KOLLAR-KOTELLY**
United States District Judge